**FLCT, LTD. and Field Street Development I, Ltd., Appellants**

v.

**CITY OF FRISCO, Texas, Appellee**

**NO. 02–14–00335–CV**

Court of Appeals of Texas, Fort Worth.

**DELIVERED: May 26, 2016**

---

Arthur J. Anderson, Winstead PC, Dallas, TX, Attorney for Appellants.

Richard M. Abernathy & Ross Wells, Abernathy, Roeder, Boyd & Hullett, P.C., McKinney, TX, Terry D. Morgan, Terry Morgan & Associates, PC, Dallas, TX, for Attorneys for Appellee.

PANEL: LIVINGSTON, C.J.; WALKER and SUDDERTH, JJ.

## OPINION

TERRIE LIVINGSTON, CHIEF JUSTICE

This is an appeal from a final judgment granting the City of Frisco, Texas's plea to the jurisdiction and dismissing with prejudice all of the claims of appellants FLCT, Ltd. and Field Street Development I, Ltd. (collectively, Owners) against the City. In four issues, Owners contend that the trial court erred by granting the plea to the jurisdiction because (1) their case is ripe for adjudication, (2) they properly alleged a regulatory takings claim for which the City is not immune, (3) they pled sufficient facts to show that a December 2012 zoning ordinance amendment enacted by the City is "null and void" because the City did not deliver them proper notice under local government code section 211.007(c), and (4) the City's immunity from suit is waived as to Owners' declaratory judgments act claims because they asserted valid claims under chapter 245 of the local government code. We affirm in part and reverse and remand in part.

### I. Background

Owners are two partnerships that own adjacent property in Frisco, Denton County, at the southeast corner of Teel Parkway and Eldorado Parkway. FLCT's tract is located on the actual corner where the two streets meet (the hard corner); Field's tract is located directly east of FLCT's and abuts both Eldorado and Teel. FLCT bought its tract in 2006, and Field bought its tract in 2007. At the time, Stephen Williamson was the president of the general partners of FLCT and Field.

The two tracts are located in the City's Commercial–1 (C–1) district. In both 2006 and 2007, the City's zoning ordinance permitted property owners in the C–1 district

to sell beer and wine "by right,"[1] subject to certain restrictions. Of concern in this case, beer and wine package sales were prohibited within three hundred feet of a public school. However, no public school was located within three hundred feet of FLCT's or Field's tracts in either 2006 or 2007.

In 2008, Owners submitted a preliminary site plan application for the two tracts to the City. The plan included a proposed convenience store with gas pumps on the hard corner and "[s]ix medical office buildings, a restaurant, a bank, a retail building, [and] a car was[h]" on the remainder. Nothing on the application indicated that beer and wine sales were contemplated on either of the two tracts.

After Owners submitted the preliminary site plan, also in 2008, Frisco ISD began negotiating with Owners to purchase the southernmost part of FLCT's and Field's tracts for an elementary school. Williamson was concerned about whether, after the sale, the sale of beer and wine at a convenience store located on the remaining part of the two tracts would be prohibited. Williamson and Frisco ISD's representative, Richard Wilkerson, agreed that Wilkerson would meet with a City representative to confirm whether the City would allow a convenience store to sell beer and wine on Owners' remaining property (hereinafter referred to as the Property) if a school was built on the property to be sold to Frisco ISD. On January 22, 2009, the City's then Development Coordinator, Scott Ingalls, sent Wilkerson a letter stating that he understood the convenience store "does plan on selling beer and wine in addition to fuel and other items" and recognizing that "there is a concern about

whether or not the store would be able to sell beer and wine if a school were built on the adjacent property." Ingalls stated that "[i]t becomes a matter of which use is in for approval first." Thus, he continued, "[s]ince there is an application for a preliminary site plan for the [convenience] store they become the first use in for approval[;] [a]s long as they continue to move forward with site plan approval and construction they will retain the ability to sell beer and wine at the [convenience] store."

Before Owners closed on the sale to Frisco ISD, they filed an amended preliminary site plan application with the City, which deleted the property to be sold to Frisco ISD and on which the medical office buildings were to have been built. The City approved the amended preliminary site plan application on February 24, 2009. The description of the plan stated, "A restaurant with a drive-thru, a bank, a car wash, and a convenience store with gas pumps on 4.2± acres on the southeast corner of Eldorado Parkway and Teel Parkway. Zoned Commercial–1. Neighborhood # 45." On March 24, 2009, the City's Planning and Zoning Commission approved a conveyance plat for the George & Debra Purefoy Elementary School, which showed the division between the Property and the Frisco ISD tract. Owners executed a deed to Frisco ISD on March 25, 2009, which was recorded in the Denton County property records.

Also on March 25, 2009, Owners and Frisco ISD entered into a Development Agreement and Restrictive Covenants, which was likewise recorded in the Denton County property records. In the development agreement, beer and wine sales are

**1.** The City's zoning ordinance defined the term "Beer & Wine Package Sales" as "[a]n establishment engaged in the selling of beer and/or wine to the general public for off-site personal or household consumption and rendering services incidental to the sale of such goods."

addressed as follows: "The Parties acknowledge that [Owners] intend[ ] to sell, and the City of Frisco, Texas will allow the sale of, alcoholic beverages on Tract B [the Property]." The City issued a building permit for the school in April 2009.

In late August 2009, the City Council amended the zoning ordinance regarding alcohol sales. It deleted the definition of beer and wine package sales and replaced it with the following: "Package Sales—an establishment *principally* for the retail sale of alcoholic beverages, as defined in the Texas Alcoholic Beverage Code, as amended, to the general public for off-premise consumption and rendering services that are incidental to the sale of such goods." [Emphasis added.] It further amended the former restriction on beer and wine package sales within three hundred feet of a school to provide that "[a] Package Sales Establishment shall not be located within ... [t]hree hundred (300) feet from a ... public school."

Owners subsequently began negotiating with Racetrac to purchase the hard corner of the Property for a convenience store and gas station. The City accepted an application for a site plan and conveyance plat for the Racetrac development on November 9, 2009. But on November 11, 2009, Ingalls told Williamson that the City would not allow the sale of alcoholic beverages on the Property "due to the close proximity of [the] elementary school that is under construction." Ingalls documented this conversation in a letter dated November 17, 2009. Ingalls had a similar conversation with counsel for Racetrac on November 13, 2009. As a result, Racetrac terminated negotiations with Owners and eventually bought property at the northwest corner of Teel and Eldorado, just

over three hundred feet from the school. The City issued a certificate of occupancy for the school on August 3, 2010, and it has been in continuous operation ever since.

On August 5, 2010, Owners' engineer submitted a request to extend the expiration date on the site plan for the Property, which the City granted until February 28, 2011. Owners directed the engineer to prepare a final site plan application for the Property, which he submitted on February 21, 2011. The City approved the final site plan, which was consistent with the preliminary site plan that the City had approved earlier, on May 10, 2011, effective until February 21, 2013. The final site plan showed proposed fuel tanks and a canopy on the side of the Property located closest to Eldorado and a proposed gas station on the southern side of the Property, with ingress and egress to both Eldorado and Teel.

When the engineer submitted the final site plan application, FLCT was negotiating to lease the hard corner to 7–Eleven, Inc. for the operation of a convenience store with gas pumps and beer and wine sales. In March 2012, FLCT and 7–Eleven signed a ground lease, for which FLCT filed a substantially conforming site plan, similar to the final site plan, on June 25, 2012. The City approved the plan on July 19, 2012, effective until February 21, 2013. 7–Eleven applied for a building permit before the expiration of the substantially conforming and final site plans. The continued validity of the ground lease was conditioned on 7–Eleven's being able to obtain all permits, licenses, and approvals necessary to sell "beer, wine and alcoholic products."

In late September 2012, 7–Eleven Beverage Company, Inc.[2] completed a Texas

---

**2.** Although they are separate entities, we will refer to both 7–Eleven, Inc. and 7–Eleven Beverage Company, Inc. as 7–Eleven.

Alcoholic Beverage Commission (TABC) permit application to sell beer and wine on its proposed premises. The application form required a certification from the City Secretary that the location was either in a wet or dry area and whether the sale of beer and wine is prohibited by charter or ordinance.[3] Owners presented as evidence an affidavit in which Williamson stated that 7–Eleven also submitted the application to the City Secretary in September 2012, but the City presented evidence that 7–Eleven did not submit the application to the City Secretary until around November 5, 2012.

Around October 1, 2012, counsel for Owners sent a demand letter to the City attorney contending that they and 7–Eleven had the right to sell beer and wine on the Property. Counsel for Owners and the City, as well as the City's Planning Director, John Lettelier, met on October 10, 2012. According to an affidavit of Owners' counsel, Lettelier "experienced surprise that the City's current ordinances did not prohibit alcohol sales at convenience stores on properties similar to" the Property.

On October 23, 2012, the City Council enacted a new ordinance, which amended chapter 10 of the City Code—not the City's zoning ordinance—by adding a paragraph prohibiting the sale of alcoholic beverages within three hundred feet of a church, school, or public hospital.

On December 4, 2012, counsel for the City sent an email to counsel for Owners informing him that the City Secretary would not be signing the certification on 7–Eleven's off-site permit application. Counsel for the City followed with a letter the next day in response to Owners' October 2012 demand letter. In it, he noted that "[i]t has always been the intent and goal of Frisco to prohibit such sales close to schools, churches and hospitals. Any failure to do so would be an oversight and inadvertent error." He further explained the City's position that the certification is not a permit required by the City of Frisco and, thus, not subject to chapter 245 of the local government code.

On December 18, 2012, effective December 28, 2012, the City amended its zoning ordinance to change the definition of Package Sales to Alcoholic Beverage Sales: "Alcoholic Beverage Sales ... shall mean any establishment, place of business or person engaged in the selling of alcoholic beverages, as defined in the Texas Alcoholic Beverage Code, as amended, to the general public for off-premise personal or household consumption." It amended the paragraph that formerly related to Package Sales to state that "Alcoholic Beverage Sales shall not be located within ... [t]hree hundred (300) feet from a church, public school, and/or private school." [4]

As of January 2013, the City Secretary had still not completed the certification part of 7–Eleven's permit application; counsel for the City indicated to counsel for 7–Eleven that the City had taken the position that the certification was not

---

3. *See* Tex. Alco. Bev.Code Ann. § 11.37(b) (West Supp.2015) (requiring certification), § 251.71(a) (West 2007) ("An area is a 'dry area' as to an alcoholic beverage of a particular type and alcohol content if the sale of that beverage is unlawful in the area. An area is a 'wet area' as to an alcoholic beverage of a particular type and alcoholic content if the sale of that beverage is lawful in the area.").

4. Although the paragraph numbering is slightly different in the December 2012 amendment to the zoning ordinance, the evidence shows that a newly-numbered zoning ordinance was adopted on April 5, 2011, which appears to have renumbered sections and paragraphs. Neither party contends that the adoption of the newly-numbered zoning ordinance effected a substantive change to the paragraphs at issue here.

needed for the TABC permit application process to continue. Counsel for 7–Eleven sent an email to counsel for the City clarifying that 7–Eleven was not asking the City Secretary to certify that the area was wet, just that the City Secretary certify either one option or the other.

7–Eleven eventually sued the City under section 11.37(d) of the alcoholic beverage code seeking an order requiring the City Secretary to make the statutory certification. Tex. Alco. Bev.Code Ann. § 11.37(d) (West Supp.2015). On March 27, 2013, the trial judge[5] found that "the Frisco City Secretary was required by statute to sign 7–[Eleven]'s TABC Off–Premises Prequalification Packet after it was presented" and ordered the City Secretary to complete the certification within thirty days. The City Secretary signed the certification on May 3, 2013, stating that "the location is prohibited by the Ordinances of the City of Frisco, Texas, individually and collectively."

7–Eleven's suit against the City continued, and in August 2013, Judge Garcia held a hearing on 7–Eleven's application for a beer and wine permit. The appellate record does not include the pleadings in the Denton County Court at Law Number Two case, nor does it show whether the TABC had any direct involvement with the permit application. At the hearing, 7–Eleven argued that the City Secretary should be required to change her certification to state that beer and wine sales were permitted on the Property because—since the Owners began development of the Property before the school began its development—the three-hundred-foot restriction did not apply.[6] During the hearing,

Judge Garcia clarified his understanding of the issue as it was presented to him:

> The only thing I'm considering is the only thing I'm required to consider and hopefully nothing else, and that is on the day that [the City Secretary] was asked to certify whether or not this was wet or dry for the purposes of the application process that that particular—that there was something in place that would require her to attest to something other than what she attested to.
>
> In other words, I believe my sole issue on the beer and wine permit application is when [the City Secretary] received the application was there an ordinance in place. And all the other collateral issues that we're dealing with right now I think are a little bit different than what in this particular hearing I'm required to do.
>
> I think the only thing they've asked me to do is did [the City Secretary] attest to it correctly. They believe it's incorrect. You believe that she ... attested to it correctly. Because, even when I ... asked her to sign it on that date, in fact, the ordinance was in place, I don't know if I can go back and say, no, it wasn't in place at the time that you attested to it and therefore your signature was wrong; I don't think I can do that, to be honest with you. I really don't think I can do that because on the day that she signed it that's what her—that's what the ordinance says.
>
> . . . .
>
> ...And whether or not that gets you to where you needed, to where you want me to go back and say she shouldn't

---

Denton County Criminal Court Number Three Judge David D. Garcia was sitting for Judge Robert Ramirez, the presiding judge of Denton County Court at Law Number Two.

6. The order signed by the trial judge states that "a hearing was conducted on [7–Eleven's] objection to the City of Frisco's certification of the TABC Off-Premise Prequalification Packet."

have done it because the application process was started a long time ago on vested rights argument, I'm not sure that's valid in a beer and wine permit application.... I just don't know if that's something that I can do on a beer and wine application. That's for another matter, another day, another court to decide that issue that you've brought before me, okay?

Judge Garcia signed an order denying 7–Eleven's "request to direct the City of Frisco City Secretary to certify that the location for which the TABC Off-Premise Prequalification Packet (Form L–OFF) is sought is in a wet area." 7–Eleven thus ceased its development of the Property, and the transaction with Owners terminated.

On November 22, 2013, Owners submitted a vested rights petition to the City under section 9.03 of the City Code and chapter 245 of the local government code. Tex. Loc. Gov't Code Ann. §§ 245.001–.007 (West 2005). In their petition, Owners contended that they

> have the right to sell beer and wine on the Property in accordance with City ordinance and state law because the original preliminary site plan application was submitted (with subsequent site plans approved) prior to (a) the school construction being approved by the City, and (b) the City enacting an ordinance imposing separation criteria applicable to the sale of beer and wine at a convenience store. [Emphasis added.]

The City denied the petition on January 6, 2014, and Owners filed this suit in the Denton County probate court. The City filed a plea to the jurisdiction, which the trial court granted on October 13, 2014 after an evidentiary hearing, dismissing all of Owners' claims with prejudice.

## II. Plea to the Jurisdiction Standard of Review

We review the trial court's ruling on a plea to the jurisdiction under a de novo standard of review. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex.2004); *City of Wichita Falls v. Jenkins*, 307 S.W.3d 854, 857 (Tex. App.—Fort Worth 2010, pet. denied). The plaintiff has the burden of alleging facts that affirmatively establish the trial court's subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993); *Eden Cooper, LP v. City of Arlington*, No. 02–11–00439–CV, 2012 WL 2428481, at *3 (Tex.App.—Fort Worth June 28, 2012, no pet.) (mem.op.). We construe the pleadings liberally in favor of the plaintiff, look to the pleader's intent, and accept the pleadings' factual allegations as true. *Miranda*, 133 S.W.3d at 226. Whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction is a question of law. *Id.*; *Jenkins*, 307 S.W.3d at 857.

If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do. *Miranda*, 133 S.W.3d at 227; *Jenkins*, 307 S.W.3d at 857. If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the factfinder. *Miranda*, 133 S.W.3d at 227–28; *Jenkins*, 307 S.W.3d at 857. But if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Miranda*, 133 S.W.3d at 228; *Jenkins*, 307 S.W.3d at 857. This standard generally mirrors that of a traditional summary judgment. *Miranda*, 133

S.W.3d at 228; *Jenkins,* 307 S.W.3d at 857; *see* Tex.R. Civ. P. 166a(c).

## III. Owners' Fifth Amended Petition

█ In their Fifth Amended Petition, Owners first raised a regulatory takings [7] claim under *Penn Central* and *Sheffield*: "The City's intentional refusal to allow the Owners to use their Property in accordance with the Owners' investment-backed expectations to sell beer and wine is a temporary or permanent taking of [their] property rights in violation of Art. I, § 17 of the Texas Constitution." *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Sheffield Dev. Co. v. City of Glenn Heights,* 140 S.W.3d 660 (Tex.2004); *see also* Tex.R. Civ. P. 45, 47 (providing for liberal, "fair notice" construction of pleadings); *Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex.1993) (op. on reh'g) (acknowledging same). They also sought several declaratory judgments: (1) that in accordance with local government code chapter 245, the project commenced in 2008, or alternatively in 2011, for purposes of their vested rights; (2) that the City is prohibited from applying or enforcing beer and wine sales distance requirements to the Property under chapter 245; (3) that the December 2012 zoning ordinance amendment is void for lack of proper notice to Owners under chapter 211 of the local government code; and (4) alternatively, that the December 2012 zoning ordinance amendment is not one of the enumerated "municipal zoning regulation[s]" to which chapter 245 expressly does not apply. *See* Tex. Loc. Gov't Code Ann. § 211.007(c) (West Supp. 2015) (providing for individual notice to property owners upon change in zoning classification), § 245.004(2) (exempting certain types of municipal zoning regulations from scope of chapter 245). Owners also pled for attorney's fees under the declaratory judgments act. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (West 2015).

As supporting facts, Owners alleged (1) that their "reasonable investment-based property expectations at the time of [the] land purchase were for future development of uses in accordance with the C–1 District zoning, including a convenience store with gas pumps which could sell beer and wine as an incidental use on the [Property]" and (2) that "[t]he initial permits for the Owner[s'] development project were submitted and approved prior to the enactment of City ordinances prohibiting beer and wine sales at the site in accordance with Chapter 245, Tex. Loc. Gov't Code." They also alleged that when Frisco ISD bought its tract, "the City ordinances did not include a separation requirement for convenience stores selling beer and wine within 300 feet of public schools" and that because counsel for Frisco ISD was the same as counsel for the City, the City had constructive notice of the agreement between Owners and Frisco ISD. Additionally, Owners alleged that the City had actual notice of the terms of their agreement with Frisco ISD because of the Ingalls letter. Owners further alleged that the City's zoning ordinance did not prohibit the sale of beer and wine on their tracts in February 2009 when the City approved the preliminary site plan for the Property that showed the school district as the adjacent property owner.

According to Owners, the Racetrac deal fell through because the City erroneously

---

**7.** A regulatory takings claim is a type of inverse condemnation claim, *Edwards Aquifer Auth. v. Bragg,* 421 S.W.3d 118, 134 (Tex. App.—San Antonio 2013, pets. denied) (op. on reh'g), and can include a governmental entity's application of a zoning law in a way that constitutes a taking, *e.g., Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 933 (Tex.1998), *cert. denied,* 526 U.S. 1144, 119 S.Ct. 2018, 143 L.Ed.2d 1030 (1999).

informed Racetrac that beer and wine sales were not permitted on the Property even after the 2009 amendment to the zoning ordinances. Further, "[i]n reliance upon the representations and acknowledgement of the parties that beer and wine could be sold on [Owners'] property, [Owners] spent over $220,000.00 to construct public improvements that would benefit the City." Finally, Owners contend that

> [t]he ... project for a convenience store selling beer and wine predates the school's site plan, and the City's 2012 ordinances prohibiting beer and wine sales cannot be applied to Owners. In 2009 and subsequently until 2012, the City did not have an ordinance which imposed a separation requirement between a school and a convenience store which sells beer and wine.

## IV. The City's First Amended Plea to the Jurisdiction

The City raised numerous grounds in its first amended plea to the jurisdiction. Generally, the City asserted that Owners failed to allege facts to support their claims. As to Owners' declaratory judgment claims, the City asserted that there is no real or live controversy between the parties because no TABC permit proceeding is pending; therefore, the City has not denied Owners anything. Additionally, the City asserted that even if a live controversy exists, the declaratory relief requested would not resolve the controversy because the City has no power to issue a TABC permit and because the TABC would not be bound to issue a permit even if Owners were to prevail on their declaratory judgment claims. The City's remaining grounds, which we will discuss in detail in our discussion of Owners' issues, challenged whether immunity from suit has been waived for both the declaratory judgment claims and the regulatory takings claim.

Factually, the City pointed out that the adjacent school was built and operating two years before the City issued a building permit for the convenience store. It noted that the separation requirements existed when Owners first purchased their tracts and filed their first permit application and when 7–Eleven submitted the TABC permit for the City to certify. The City also pointed out that beer and wine sales were not included in Owners' preliminary site plan and initial development permit filed with the City on July 28, 2008 or on "any of the other development permits submitted to the City for approval submitted over the next five (5) years."

## V. Existence of Justiciable Controversy

In their first issue, Owners challenge the City's claim that there is no justiciable controversy over which the trial court can assert jurisdiction because (1) the City has not denied any permit to Owners upon which a chapter 245 claim could be based and (2) even if there were a live controversy, the declaratory relief requested would not resolve that controversy.

The general test for standing in Texas courts requires that there be a real controversy between the parties that actually determines the judicial declaration sought. *Tex. Ass'n of Bus.*, 852 S.W.2d at 446. Thus, for a court to have subject-matter jurisdiction over a suit requires that there be a live controversy between the parties. *State Bar v. Gomez*, 891 S.W.2d 243, 245 (Tex.1994). Any decision rendered in the absence of a live controversy is advisory only and, thus, prohibited by Texas law. *Id.*

The declaratory judgments act allows a person whose "rights, status, or

other legal relations are affected by a ... municipal ordinance" to "have determined any question of construction or validity arising under the ... ordinance" and to "obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem.Code Ann. § 37.004(a) (West 2015). But the act does not create or enlarge a trial court's subject matter jurisdiction; it is "merely a procedural device for deciding cases already within a court's jurisdiction." *Devon Energy Prod. Co., L.P. v. KCS Res., LLC,* 450 S.W.3d 203, 210 (Tex.App.—Houston [14th Dist.] 2014, pet. denied) (quoting *Tex. Ass'n of Bus.,* 852 S.W.2d at 444). Thus, a declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the declaration will resolve the controversy. Tex. Civ. Prac. & Rem.Code Ann. § 37.008 (West 2015) ("The court may refuse to render or enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding."); *Bonham State Bank v. Beadle,* 907 S.W.2d 465, 467 (Tex.1995); *Devon Energy,* 450 S.W.3d at 210. In other words, the act "gives the court no power to pass upon hypothetical or contingent situations, or determine questions not then essential to the decision of an actual controversy, although such questions may in the future require adjudication." *Riner v. City of Hunters Creek,* 403 S.W.3d 919, 922 (Tex.App.—Houston [14th Dist.] 2013, no pet.).

Here, even though there is no current application for a TABC permit pending, Owners have alleged that the City's enforcement of the October and December 2012 ordinances—as evidenced by Ingalls's communications to Racetrac and Williamson in 2009, the City Secretary's prior certification that the sale of alcoholic beverages at the Property was prohibited by City ordinance, and the City's denial of their vested rights petition—has resulted in the inability of Owners, their prospective tenants, or both to sell beer and wine from any proposed convenience store development or use and that they had intentions to pursue this development or use. Thus, a declaration that those ordinances are void and unenforceable against the Property because of the operation of chapter 245 would resolve the controversy with respect to whether the City can continue to impose its own local ordinance restrictions as to alcohol sales on the Property, including with respect to certifications on any future permit applications. *See, e.g., City of Anahuac v. Morris,* 484 S.W.3d 176, 179 (Tex.App.—Houston [14th Dist.] 2015, pet. filed); *Cont'l Homes of Tex., L.P. v. City of San Antonio,* 275 S.W.3d 9, 20 (Tex.App.—San Antonio 2008, pet. denied); *see also City of Ingleside v. City of Corpus Christi,* 469 S.W.3d 589, 592 (Tex. 2015) (noting in context of boundary dispute declaratory judgment claim involving interpretation of city ordinance that "[ ]Interpreting and applying an ordinance is also well within judicial authority"). As the City acknowledged in its plea to the jurisdiction, Owners "plead four (4) requests for declaratory relief, the purpose of which, if successful, would allow them to *reapply* to the TABC for a permit to sell beer and wine on their Property." [8] [Emphasis added.]

---

8. This is different from *Village of Tiki Island v. Premier Tierra Holdings, Inc.,* 464 S.W.3d 435 (Tex.App.—Houston [14th Dist.] 2015, no pet.), in which the court of appeals held that there was no justiciable controversy because the plaintiff never alleged or showed why the city denied its plat application upon which its claims were based, and because it made no such allegation or showing, it likewise could not show whether its alleged injury was a result of the city's refusal to allow it to exercise its vested rights. *Id.* at 442–43. Here,

Owners' suit is not seeking to force the City to perform a duty that may arise at some future time; rather, Owners are seeking a determination of the existence and extent of their rights under chapter 245 to develop and use the Property.[9] Moreover, chapter 245 itself provides the authority for a declaratory judgment action to enforce a landowner's rights. Tex. Loc. Gov't Code Ann. § 245.006(a). Accordingly, we conclude and hold that the trial court did not lack subject matter jurisdiction over the Owners' declaratory judgment claims because the controversy is justiciable and ripe for adjudication. We sustain that part of Owners' first issue that challenges the trial court's ruling on justiciability grounds.

## VI. Waiver of Immunity from Suit

In the remainder of their first issue, and in their second through fourth issues, Owners challenge the City's allegations in its plea to the jurisdiction that its immunity from suit has not been waived regarding Owners' regulatory takings and declaratory judgment claims. For convenience of the analysis, we will discuss the issues out of order, addressing the issues regarding the declaratory judgment claims first.

## A. Chapter 245 Declaratory Judgment Claims

In the remainder of their first issue, Owners contend that the trial court erred by concluding that the City is immune from suit on Owners' chapter 24 declaratory judgment claims because the alcoholic beverage code does not pre-empt chapter

however, the City's refusal to allow beer and wine sales on Owners' property was both alleged and shown.

9. This is a separate issue from whether Owners have alleged a valid chapter 245 claim for which immunity is waived. *See* Tex. Loc. Gov't Code Ann. § 245.006(b).

245 and the section 11.37(d) appeals process in the alcoholic beverage code is not an exclusive remedy.

### 1. Alcoholic Beverage Code Does Not Pre-empt Claims

The City argues that the alcoholic beverage code exclusively governs the process for a TABC permit application; thus, Owners are limited to the remedies, if any, set forth in that code regarding alcoholic beverage permits and licenses.

 Home-rule cities have the full power of self-government and look to the Texas Legislature, not for grants of power, but only for limitations on their powers.[10] S. *Crushed Concrete, LLC v. City of Houston,* 398 S.W.3d 676, 678 (Tex.2013). The legislature may pre-empt a subject matter normally within a home-rule city's broad powers only if it does so with unmistakable clarity. *Id.*

Article XVI, section 20(b)–(c), of the Texas Constitution provides as follows:

> (b) The Legislature shall enact a law or laws whereby the qualified voters of any county, justice's precinct or incorporated town or city, may, by a majority vote of those voting, determine from time to time whether the sale of intoxicating liquors for beverage purposes shall be prohibited or legalized within the prescribed limits; and such laws shall contain provisions for voting on the sale of intoxicating liquors of various types and various alcoholic content.

10. The City of Frisco is a home-rule city and is located in both Collin and Denton counties. *State v. Kurtz,* 152 S.W.3d 72, 73 (Tex.Crim. App.2004); *see also* Tex. Const. art. XI, § 5.

(c) In all counties, justice's precincts or incorporated towns or cities wherein the sale of intoxicating liquors had been prohibited by local option elections held under the laws of the State of Texas and in force at the time of the taking effect of Section 20, Article XVI of the Constitution of Texas, it shall continue to be unlawful to manufacture, sell, barter or exchange in any such county, justice's precinct or incorporated town or city, any spirituous, vinous or malt liquors or medicated bitters capable of producing intoxication or any other intoxicants whatsoever, for beverage purposes, unless and until a majority of the qualified voters in such county or political subdivision thereof voting in an election held for such purpose shall determine such to be lawful; provided that this subsection shall not prohibit the sale of alcoholic beverages containing not more than 3.2 percent alcohol by weight in cities, counties or political subdivisions thereof in which the qualified voters have voted to legalize such sale under the provisions of Chapter 116, Acts of the Regular Session of the 43rd Legislature.

Tex. Const. art. XVI, § 20. Thus, the Texas constitution allows municipalities to hold elections within their city limits to determine whether the sale of alcoholic beverages will be permitted within those boundaries. *See id.* Chapter 501 of the election code and chapter 251, subchapter D of the alcoholic beverage code effectuate these constitutional requirements. *In re Davis,* 269 S.W.3d 581, 583–84 (Tex.2008) (orig.proceeding).

The alcoholic beverage code provides that "[u]nless otherwise specifically provided by the terms of th[e] code, the manufacture, sale, distribution, transportation, and possession of alcoholic beverages shall be governed exclusively by the provisions of th[e] code." Tex. Alco. Bev.Code Ann. § 1.06 (West 2007). Regarding regulation of businesses that sell alcohol by state governmental entities, section 109.57 of the alcoholic beverage code provides as follows:

(a) *Except as is expressly authorized by this code,* a regulation, charter, or ordinance promulgated by a governmental entity of this state may not impose stricter standards on premises or businesses required to have a license or permit under this code than are imposed on similar premises or businesses that are not required to have such a license or permit.

(b) It is the intent of the legislature that this code shall exclusively govern the regulation of alcoholic beverages in this state, and that *except as permitted by this code,* a governmental entity of this state may not discriminate against a business holding a license or permit under this code.

(c) Neither this section nor Section 1.06 of this code affects the validity or invalidity of a zoning regulation that was formally enacted before June 11, 1987, and that is otherwise valid, or any amendment to such a regulation enacted after June 11, 1987, if the amendment lessens the restrictions on the licensee or permittee or does not impose additional restrictions on the licensee or permittee. For purposes of this subsection, "zoning regulation" means any charter provision, rule, regulation, or other enactment governing the location and use of buildings, other structures, and land.

(d) This section does not affect the authority of a governmental entity to regulate, in a manner as otherwise permitted by law, the location of:

(1) a massage parlor, nude modeling studio, or other sexually oriented business;

(2) an establishment that derives 75 percent or more of the establishment's gross revenue from the on-premise sale of alcoholic beverages; or

(3) an establishment that:

(A) derives 50 percent or more of the establishment's gross revenue from the on-premise sale of alcoholic beverages; and

(B) is located in a municipality or county, any portion of which is located not more than 50 miles from an international border.

(e) A municipality located in a county that has a population of 2.2 million or more and that is adjacent to a county with a population of more than 600,000 or a municipality located in a county with a population of 600,000 or more and that is adjacent to a county with a population of 2.2 million or more may regulate, in a manner not otherwise prohibited by law, the location of an establishment issued a permit under Chapter 32 or 33 if:

(1) the establishment derives 35 percent or more of the establishment's gross revenue from the on-premises sale or service of alcoholic beverages and the premises of the establishment are located in a dry area; and

(2) the permit is not issued to a fraternal or veterans organization or the holder of a food and beverage certificate.

*Id.* § 109.57 (West Supp.2015) (emphasis added). Construing section 109.57, the Texas Supreme Court has held that under most circumstances, the alcoholic beverage code pre-empts an ordinance of a home-rule city that regulates where alcoholic beverages are sold. *Dallas.Merchant's & Concessionaire's Ass'n v. City of Dallas,* 852 S.W.2d 489, 492 (Tex.1993) (holding that alcoholic beverage code pre-empted city ordinances *to the extent of a conflict).*

But section 109.57 itself acknowledges that state governmental entities may regulate the locations of certain types of enumerated establishments that sell alcohol, and the emphasized language in section 109.57(a) and (b) contemplates that other provisions of the code might allow a state governmental entity to impose such regulations. Tex. Alco. Bev.Code Ann. § 109.57(a), (b). Therefore, we look to other provisions of the code to determine if the City's application of its distance requirements as to the Property is pre-empted.

Section 109.33(a)(1) of the alcoholic beverage code, originally enacted in 1935 as part of the Texas Liquor Control Act, provides that "[t]he governing board of an incorporated city or town may enact regulations applicable in the city or town, prohibiting the sale of alcoholic beverages by a dealer whose place of business is within: (1) 300 feet of a church, public or private school, or public hospital." *Id.* § 109.33(a)(1) (West 2007); *see* Act of Nov. 8, 1935, 44th Leg., 2d C.S., ch. 467, art. 1, § 25(e), 1935 Tex. Gen. Laws 1795, 1818, 1842. In addition, section 109.32 provides that an incorporated city may by ordinance "regulate the sale of beer and prescribe the hours when it may be sold, except [that it] may not permit the sale of beer when its sale is prohibited" by the code. *Id.* § 109.32 (West 2007). And subsections (e) and (h) of section 109.33 provide that

(e) The commissioners court of a county or the governing board of a city or town that has enacted a regulation under Subsection (a) of this section may also allow variances to the [distance] regulation if the commissioners court or governing body determines that enforcement of the regulation in a particular instance is not in the best interest of the public, constitutes waste or inefficient use of land or other resources, creates

an undue hardship on an applicant for a license or permit, does not serve its intended purpose, is not effective or necessary, or for any other reason the court or governing board, after consideration of the health, safety, and welfare of the public and the equities of the situation, determines is in the best interest of the community.

....

(h) Subsection (a)(1) does not apply to the holder of:

(1) a license or permit who also holds a food and beverage certificate covering a premise that is located within 300 feet of a private school; or

(2) a license or permit covering a premise where minors are prohibited from entering under Section 109.53 and that is located within 300 feet of a private school.

*Id.* § 109.33(e), (h). Thus, not only does the alcoholic beverage code permit a city to enact distance regulations falling within the scope of section 109.33—with only two enumerated exceptions under subsection (h)—it also allows the city to grant variances as to enforcement of those distance requirements. *See id.* Accordingly, the code does not pre-empt the City's enactment and enforcement of the distance requirements in this case.

■■ The City argues that the separation requirements are "designed to implement a state regulatory scheme." But nothing in the alcoholic beverage code requires the City to enact such separation standards; the code merely allows a city to enact them by charter or ordinance rather than by a city-wide vote such as must be done for a city to be designated wet or dry. As the City acknowledged in its plea to the jurisdiction, "the City's certification process [on a retailer's permit application] entails the application of a local regulation authorized by a statutory scheme." Own-

ers are not challenging the alcoholic beverage code provision but rather the City's local regulation by ordinance. We therefore conclude and hold that the alcoholic beverage code does not pre-empt claims under local government code chapter 245 with respect to city ordinances enacted under the authority of section 109.33(a)(1). *See Dallas Merchant's & Concessionaire's Ass'n,* 852 S.W.2d at 491 (noting that a general law and a city ordinance will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached); *Pak–a–Sak, Inc. v. City of Perryton,* 451 S.W.3d 133, 136 (Tex.App.—Amarillo 2014, no pet.) (holding that city did not act outside authority of alcoholic beverage code by passing ordinance prohibiting sale or delivery of alcohol in residential area when prohibition in ordinance mirrored prohibition in alcoholic beverage code); *cf. Aero Meridian Assocs. DP v. City of Denison,* No. 4:06cv457, 2007 WL 2900536, at *5–7 (E.D.Tex. Sept. 28, 2007) (holding that alcoholic beverage code did not pre-empt city's denial of a specific-use alcohol permit for private club in shopping center because of public health and welfare concerns related to increased traffic and nuisance); *State v. DeLoach,* 458 S.W.3d 696, 699–700 (Tex.App.—San Antonio 2015, pet. ref'd) (op. on reh'g) (holding that Texas Towing and Booting Act did not pre-empt city ordinance regulating nonconsent tows because part of the Act granted authority to governing bodies to regulate nonconsent tow fees so long as the regulation was consistent with other parts of the Act); *Secured Envtl. Mgmt., Inc. v. Tex. Nat. Res. Conservation Comm'n,* 97 S.W.3d 246, 256 (Tex.App.—Austin 2002, pet. denied) (applying pre-emption principles to conclude that section 361.114 of the health and safety code is not pre-empted by federal law), *cert. denied,* 541 U.S. 902, 124 S.Ct. 1601, 158 L.Ed.2d

244 (2004); *B & B Vending Co. v. City of Garland*, 711 S.W.2d 132, 134 (Tex.App.—Tyler 1986, writ ref'd n.r.e.) (upholding part of ordinance imposing similar distance requirements from public schools for the operation of coin operated amusement machines but holding that remainder of ordinance prohibiting operation of such machines within 300 feet of residentially zoned property conflicted with governing statute).

The City urges that *Guitar Holding Co. v. Hudspeth County Underground Water Conservation District No. 1* compels a different holding. 209 S.W.3d 172 (Tex. App.—El Paso 2006), *rev'd*, 263 S.W.3d 910 (Tex.2008). In that case, the court considered whether a property owner could bring a chapter 245 claim against a water conservation district for holding the property owner to permitting standards implemented after the property owner's claimed rights vested. 209 S.W.3d at 189–91. The water code provides that a water conservation district "may not impose more restrictive permit conditions on transporters than the district imposes on existing in-district users" and contains an exception providing that such a district may impose more restrictive conditions on new users than historic users but only if it does so uniformly and reasonably so as "to protect existing use." Tex. Water Code Ann. §§ 36.113(e), 36.122(c), (e) (West Supp.2015); *Guitar Holding*, 209 S.W.3d at 185. The court of appeals held that the water code regulatory scheme pre-empted any chapter 245 claim because intervening provisions of the water code, such as a provision requiring a district to consider permits according to a water management plan, mandated that the district apply its newer permitting requirements. *Guitar Holding*, 209 S.W.3d at 190–91. Additionally, the old rules in which Guitar Holding claimed a vested right directly violated section 36.122(c), which prohibits a district from applying more restrictive permit conditions on transporters than in-district users. *Id.* at 191.

The application and scope of the water code provision in *Guitar Holding* is different from the application and scope of the alcoholic beverage code to this case. Here, unlike the water code provisions, section 109.33(a)(1) of the alcoholic beverage code delegates the right to—but does not impose a responsibility on—a city to impose three hundred foot distance restrictions via ordinance or charter. And the only two exceptions to that grant, contained in section 109.33(h), are not applicable here. Thus, *Guitar Holding's* analysis and discussion are not applicable to this case. We thus consider the City's other pre-emption related argument.

## 2. Exclusivity of Remedy/Collateral Estoppel

Owners also challenge the City's contention that the alcoholic beverage code's remedy for the denial of a permit is exclusive and precludes a chapter 245 action as to the City's distance ordinance. Thus, the City contends that instead of bringing a declaratory judgment claim on their chapter 245 claims, Owners were limited to appealing the County Court at Law Number Two's judgment denying 7–Eleven's permit application.

In other cases in which the supreme court has determined whether a legislative scheme provides the exclusive remedy for a cause of action, the supreme court has considered "the purposes, policies, procedural requirements, and remedies of [those acts] to determine whether the Legislature intended to effectively provide two different remedies." *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 441 (Tex.2012) (op. on reh'g). The purpose of and public policy behind the alcoholic beverage code is "an exercise of the police power of the

state for the protection of the welfare, health, peace, temperance, and safety of the people of the state. It shall be liberally construed to accomplish this purpose." Tex. Alco. Bev.Code Ann. § 1.03 (West 2007); *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 691 (Tex.2007) (op. on reh'g).

The full text of section 11.37 of the code provides,

(a) The county clerk of the county in which an application for a permit is made shall certify whether the location or address given in the application is in a wet area and whether the sale of alcoholic beverages for which the permit is sought is prohibited by any valid order of the commissioners court.

(b) The city secretary or clerk of the city in which an application for a permit is made shall certify whether the location or address given in the application is in a wet area and whether the sale of alcoholic beverages for which the permit is sought is prohibited by charter or ordinance.

(c) Once a permit is issued, the certification that the location or address is in a wet area may not be changed until after a subsequent local option election to prohibit the sale of alcoholic beverages.

(d) *Notwithstanding any other provision of this code,* if the county clerk, city secretary, or city clerk certifies that the location or address given in the application is not in a wet area or refuses to issue the certification required by this section, the applicant is entitled to a hearing before the county judge to contest the certification or refusal to certify. The applicant must submit a written request to the county judge for a hearing under this subsection. The county judge shall conduct a hearing required by this subsection not later than the 30th day after the date the county judge receives the written request.

Tex. Alco. Bev.Code Ann. § 11.37 (emphasis added). The legislative history of subsection (d) indicates that

in the past, when an application [for a permit] was denied based on the location listed in the application, the Texas Alcoholic Beverage Commission (TABC) allowed an applicant to contest the certification at a hearing before a county judge[, but] many applicants are not currently being given this opportunity for a hearing and in some cases, if an application is denied based on the location listed in the application, the TABC automatically refuses to issue the permit or license and refuses the applicant's request to contest the certification. [H.B.] 1959 seeks to address this issue by entitling an applicant for such a permit or license to a hearing before the county judge to contest the certification of the county clerk, city clerk, or city secretary or the refusal of any of those local officials to issue the required certification.

House Comm. on Licensing & Admin. Procedures, Bill Analysis, Tex. H.B.1959, 82nd Leg., R.S. (2011). Additionally, an applicant is entitled to appeal the TABC's denial of a permit application to the district court located in the applicant's county of residence or where the owner of involved real or personal property resides. Tex. Alco. Bev.Code Ann. § 11.67 (West Supp.2015).

With respect to local separation requirements and permits, the code provides as follows:

(a) If at the time an original alcoholic beverage permit or license is granted for a premises the premises satisfies the requirements regarding distance from schools, churches, and other types of premises established in this code and any other law or ordinance of the state

or a political subdivision of the state in effect at that time, the premises shall be deemed to satisfy the distance requirements for all subsequent renewals of the license or permit.

(b) On the sale or transfer of the premises or the business on the premises in which a new original license or permit is required for the premises, the premises shall be deemed to satisfy any distance requirements as if the issuance of the new original permit or license .were a renewal of a previously held permit or license.

(c) Subsection (b) does not apply to the satisfaction of the distance requirement prescribed by Section 109.33(a)(2) fora public school, except that on the death of a permit or license holder or a person having an interest in a permit or license Subsection (b) does apply to the holder's surviving spouse or child of the holder or person if the spouse or child qualifies as a successor in interest to the permit or license.

(d) Subsection (a) does not apply to the satisfaction of the distance requirement prescribed by Section 109.33(a)(2) fora public school if the holder's permit or license has been suspended for a violation occurring after September 1, 1995, of any of the following provisions:

(1) Section 11.61(b)(1), (6)-(11), (13), (14), or (20); or

(2) Section 61,71(a)(5)-(8), (11), (12), (14), (17), (18), (22), or (24).

*Id.* § 109.59 (West 2007). Thus, the alcoholic beverage code provides that an existing permit holder whose license has not been suspended as shown above, or that permit holder's surviving spouse, will be entitled to renew the permit if the premises later runs afoul of any county or city public-school-distance requirements. *Id.* Although the TABC has discretion over whether to grant or deny a permit or license application, it may deny a permit or license for the proposed sale of alcohol within an area voted dry in a local option election. Tex. Alco. Bev.Code Ann. § 11.43 (West 2007), § 11.46(10) (West Supp.2015); *Tri–Con, Inc. v. Tex. Alcoholic Beverage Comm'n,* No. 09–11–00058–CV, 2011 WL 2420992, at *3 (Tex.App.—Beaumont June 16, 2011, no pet.) (mem. op.).

The City cites *Sells v. Roose,* 769 S.W.2d 641 (Tex.App.—Austin 1989, no writ), as authority for its position that the sole method by which a property owner· or permit applicant can challenge distance requirements such as the ones here is via a hearing before the county judge as authorized by the alcoholic beverage code and exhaustion of any related appeals. However, *Sells* was a direct appeal from a trial court's grant of mandamus relief ordering a county clerk to certify premises as wet for purposes of a beer retailer's permit. *Id.* at 642. The court of appeals in *Sells* explained—but did not hold—that because no TABC permit application was then pending, the county clerk against whom mandamus was sought to certify a location as "wet" had no present duty that the district court could have compelled her to perform. *Id.* at 643. But the court held that neither it nor the district court had jurisdiction to consider the case on its merits because the district court could only review issues related to the county judge's administrative decision to deny the permit by invoking the judicial review set forth in sections 11.67 and 61.34 of the code,[11] which Sells did not pursue, or in a suit claiming a violation of a constitutional

11. Tex. Alco. Bev.Code Ann. § 11.67 (giving permit applicant the right to appeal a TABC order refusing, cancelling, or suspending a permit), § 61.34 (West Supp.2015) (providing for appeal from denial of a license application).

right or vested property right, neither of which Sells raised. *Id.* (citing *Stone v. Tex. Liquor Control Bd.*, 417 S.W.2d 385, 385–86 (Tex.1967)). Here, Owners have pled both a constitutional and a vested rights claim.

In *Supermercado Teloloapan, Inc. v. City of Houston*, 246 S.W.3d 272, 275 (Tex. App.—Houston [14th Dist.] 2007, pet. denied), a grocery store operator and the city of Houston disputed the interpretation of the term "boundary line" in the city's distance ordinance. After the city refused to certify the location as being in a wet area, the store operator sued for a declaratory judgment urging its interpretation. *Id.* at 274–75. In response to the dissent's position in reliance on *Sells* that the court did not have jurisdiction to decide the case because an appeal was not taken under sections 11.37 and 61.37,[12] the majority explained that because Supermercado was seeking a declaratory judgment to interpret an ordinance—an appropriate use of the declaratory judgments act—the alcoholic beverage code did not preclude Supermercado's cause of action. *Id.* at 275 n. 2 (citing *Burgess v. Gallery Model Homes, Inc.*, 101 S.W.3d 550, 554 (Tex.App.—Houston [1st Dist.] 2003, pet. denied)).

Here, Owners have raised both a constitutional claim and a vested property rights claim in the form of a declaratory judgment, which is specifically authorized by statute. They are not seeking to appeal any action by the TABC or any action in connection with a pending permit because 7–Eleven withdrew its application after the county judge denied the proceeding under section 11.37(d). Thus, this case is more akin to *Supermercado* than *Sells*.

Nothing in the alcoholic beverage code indicates that the remedy available to a permit applicant in section 11.37(d) was intended to be the only remedy available to a landowner challenging a municipality's application of distance restrictions to its property. Although Owners' ground lease tenant had applied for a permit, the section 11.37(d) remedy was clearly intended to apply only within the context of the processing of a permit application. Instead of pursuing this remedy through exhaustion of its appeals, 7–Eleven decided to abandon the permit application, the ground lease, and the prospect of constructing and operating a convenience store on the Property. The legislative history of section 11.37(d) shows that the legislature intended to provide a remedy for permit applicants. But nothing in the statutory scheme indicates an intent to preclude a landowner from having its property use rights determined outside of the context of a permit application. In contrast, section 2.03(c) of the alcoholic beverage code, governing civil liability for serving alcohol to a minor, explicitly states, "This chapter provides the exclusive cause of action for providing an alcoholic beverage to a person 18 years of age or older." Tex. Alco. Bev.Code Ann. § 2.03(c) (West 2007).

We therefore conclude and hold that the alcoholic beverage code does not provide the exclusive remedy for Owners' claims based on the City's enforcement of the distance requirements with respect to the Property. *Cf. Dealers Elec. Supply Co. v. Scoggins Constr. Co.*, 292 S.W.3d 650, 654–60 (Tex.2009) (holding that although McGregor Act provides sole remedy to laborer or materialman with respect to recovering from the surety or obligor of a public-work payment bond, it does not pre-

---

**12.** Section 61.37 is substantially the same as section 11.37, but it applies to license applica-
tions. *Id.* § 61.37 (West Supp.2015).

clude suits by a laborer or materialman to recover damages independently of such a bond); *Stanley v. Reef Sec., Inc.,* 314 S.W.3d 659, 664–65 (Tex.App.—Dallas 2010, no pet.) (construing plain language of section 153.256(d) of business organizations code, which provides that charging order is exclusive remedy for satisfying judgment out of a partner's "partnership interest," and holding that judgment creditor of partner was not precluded from seeking turnover order as to partner's distribution after it had been made and was already in partner's possession).

For the first time on appeal, the City contends that Owners' claims are barred by collateral estoppel because of the Denton County Court at Law Number Two litigation. The City raised collateral estoppel as an affirmative defense in its answer. *See Wise Elec. Coop. v. Am. Hat Co.,* 476 S.W.3d 671, 715 (Tex.App.—Fort Worth 2015, no pet.). As an affirmative defense, collateral estoppel is a plea in bar, not a jurisdictional plea. *Hall v. City of Bryan,* No. 10–12–00248–CV, 2014 WL 3724069, at *4 (Tex.App.—Waco July 24, 2014, no pet.) (mem.op.). Thus, the City's argument that Owners are collaterally estopped from bringing their chapter 245 claims would not support the trial court's dismissal for want of jurisdiction. *See id.* at *5.

We sustain the remaining part of appellant's first issue.

### 3. Zoning Ordinance Not Invalid for Lack of Notice

In their third issue, Owners contend that the trial court erred by determining that the City's immunity was not waived for their declaratory judgment claim regarding lack of notice. Specifically, Owners claim that as a matter of law, they pled a valid claim that the December 2012 changes to the City's zoning ordinance are void for lack of individual notice to them in accordance with the local government code. *See* Tex. Loc. Gov't Code Ann. § 211.007(c) (providing for individual notice to property owners of "change in a zoning classification"); *Bolton v. Sparks,* 362 S.W.2d 946, 950 (Tex.1962) (holding that city's failure to provide notice and hearing mandated by law voided ordinance). The City contends that Owners failed to plead a claim for which they could obtain relief because as a matter of law section 211.007(c) requires notice to individual property owners only when a change of zoning classification is proposed, not other types of zoning changes, and that the December 2012 distance requirements did not effect a change in the Property's zoning classification. This issue hinges on the meaning of the term "zoning classification" in section 211.007(c).

### a. Principles of Statutory Construction

Our primary objective when construing a statute is to ascertain and give effect to the legislature's intent. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006). We seek that intent first and foremost in the statutory text. *Lexington Ins. Co. v. Strayhorn,* 209 S.W.3d 83, 85 (Tex.2006). We rely on the plain meaning of the text unless a different meaning is supplied by statutory definition, is apparent from the context, or the plain meaning would lead to an absurd or nonsensical result. *Beeman v. Livingston,* 468 S.W.3d 534, 538 (Tex. 2015); *see* Tex. Gov't Code Ann. § 311.011(a) (West 2013). Further, in determining the meaning of a statute, a court must consider the entire act, its nature and object, and the consequences that would follow from each construction. *Sharp v. House of Lloyd, Inc.,* 815 S.W.2d 245, 249 (Tex.1991); *Tarrant Reg'l Water Dist. v. Bennett,* 453 S.W.3d 51, 56 (Tex. App.—Fort Worth 2014, pet. denied); *see*

Tex. Gov't Code Ann. § 311.023 (West 2013) (providing that in construing statute, a court may consider, among other things, the "(1) object sought to be attained; (2) circumstances [of enactment]; (3) legislative history; (4) common law or former statutory provisions, including laws on the same or similar subjects; (5) consequences of a particular construction; (6) administrative construction of the statute; and (7) title (caption), preamble, and emergency provision."). We presume that the entire statute is intended to be effective and that the legislature enacted it with complete knowledge of the existing law and with reference to it. Tex. Gov't Code Ann. § 311.021(2) (West 2013); *Acker v. Tex. Water Comm'n,* 790 S.W.2d 299, 301 (Tex. 1990).

### b. Local Government Code Chapter 211

Owners contend we "squarely. addressed" this issue in *City of North Richland Hills v. Home Town Urban Partners, Ltd.,* 340 S.W.3d 900 (Tex.App.—Fort Worth 2011, no pet.) (op. on reh'g). But in that case, we addressed the issue of whether the appellees had standing to bring a declaratory judgment claim contending that a change to a zoning ordinance was void in the face of the appellant's contention that the only proper vehicle for such a challenge was a quo warranto proceeding. *Id.* at 913–15. Although we cited section 211.007(c) and the law holding that zoning ordinance amendments are void if not enacted in accordance with applicable law, we did not address the issue of whether a change in use within an already existing zoning classification constitutes a change in zoning classification as contemplated by section 211.007(c). *Id.*

Likewise, Owners cite *City of McKinney v. OH Skyline/380, L.P.* as controlling, but the court in that case expressly declined to address the very issue raised here. 375 S.W.3d 580, 583 n.2 (Tex.App.—Dallas 2012, no pet.). Owners' argument is based solely on these cases, but they are not "directly on point and dispositive of the lack of notice issue" as Owners contend. Accordingly, we will consider the proper construction of the term "zoning classification" as used in section 211.007(c).

Local government code section 211.007, entitled "Zoning Commission," is located in subchapter A of chapter 211; subchapter A sets forth "General Zoning Regulations" applicable to municipalities. Tex. Loc. Gov't Code Ann. §§ 211.001–.017 (West 2008 & Supp.2015). Section 211.007 provides, in its entirety,

(a) To exercise the powers authorized by this subchapter, the governing body of a home-rule municipality shall, and the governing body of a general-law municipality may, appoint a zoning commission. *The commission shall recommend boundaries for the original zoning districts and appropriate zoning regulations for each district.* If the municipality has a municipal planning commission at the time of implementation of this subchapter, the governing body may appoint that commission to serve as the zoning commission.

(b) The zoning commission shall make a preliminary report and hold public hearings on that report before submitting a final report to the governing body. The governing body may not hold a public hearing until it receives the final report of the zoning commission unless the governing body by ordinance provides that a public hearing is to be held, after the notice required by Section 211.006(a), jointly with a public hearing required to be held by the zoning commission. In either case, the governing body may not take action on the

matter until it receives the final report of the zoning commission.

(c) Before the 10th day before the hearing date, written notice of each public hearing before the zoning commission *on a proposed change in a zoning classification* shall be sent to each owner, as indicated by the most recently approved municipal tax roll, of real property within 200 feet of the property *on which the change in classification is proposed.* The notice may be served by its deposit in the municipality, properly addressed with postage paid, in the United States mail. If the property within 200 feet of the property on which the change is proposed is located in territory annexed to the municipality and is not included on the most recently approved municipal tax roll, the notice shall be given in the manner provided by Section 211.006(a).

(c–1) Before the 10th day before the hearing date, written notice of each public hearing before the zoning commission *on a proposed change in a zoning classification affecting residential or multifamily zoning* shall be sent to each school district in which the property for which the *change in classification* is proposed is located. The notice may be served by its deposit in the municipality, properly addressed with postage paid, in the United States mail.

(c–2) Subsection (c–1) does not apply to a municipality the majority of which is located in a county with a population of 100,000 or less, except that such a municipality must give notice under Subsection (c–1) to a school district that has territory in the municipality and requests the notice. For purposes of this subsection, if a school district makes a request for notice under Subsection (c–1), the municipality must give notice of each public hearing held following the request unless the school district requests that no further notices under

Subsection (c–1) be given to the school district.

(d) The governing body of a home-rule municipality may, by a two-thirds vote, prescribe the type of notice to be given of the time and place of a public hearing held jointly by the governing body and the zoning commission. If notice requirements are prescribed under this subsection, the notice requirements prescribed by Subsections (b) and (c) and by Section 211.006(a) do not apply.

(e) If a general-law municipality exercises zoning authority without the appointment of a zoning commission, any reference in a law to a municipal zoning commission or planning commission means the governing body of the municipality.

*Id.* § 211.007 (emphasis added).

Because the term "classification" is not defined in the local government code, the City urges that, in accordance with the Code Construction Act, it should be construed according to its common meaning. Webster's Third New International Dictionary defines "classification," in pertinent part, as "a system of classes or groups or a systematic division of a series of related phenomena one of such classes: CATEGORY, RATING." Webster's Third New Int'l Dictionary 417 (2002). Two of its several definitions of "class" are "a group, set, or kind marked by common attributes or a common attribute" or "a group, division, distinction, or rating based on quality ... or condition." *Id.* at 416. Black's Law Dictionary's definitions of class include "[a] group of people, things, qualities, or activities." Black's Law Dictionary 304 (10th ed.2014). Owners urge that the term "classification" as used in this context applies to distance requirements such as the one here while the City urges that the term is used more narrowly to indicate a

rezoning from one type of district within a municipality, such as commercial, to another type of district, such as residential. In accordance with the aforementioned principles of statutory construction, we will review the legislature's use of the term in context.

The text of other provisions in subchapter A are illuminating. Section 211.005 provides as follows:

(a) The governing body of a municipality may divide the municipality into districts of a number, shape, and size the governing body considers best for carrying out this subchapter. Within each district, the governing body may regulate the erection, construction, reconstruction, alteration, repair, or use of buildings, other structures, or land.

(b) *Zoning regulations must be uniform for each class or kind of building in a district, but the regulations may vary from district to district.* The regulations shall be adopted with reasonable consideration, among other things, for the character of each district and its peculiar suitability for particular uses, with a view of conserving the value of buildings and encouraging the most appropriate use of land in the municipality.

*Id.* § 211.005 (emphasis added).

Section 211.006 reads, in its entirety:

(a) The governing body of a municipality wishing to exercise the authority relating to zoning regulations and zoning district boundaries shall establish procedures for adopting and enforcing the regulations and boundaries. *A regulation or boundary is not effective until after a public hearing on the matter at which parties in interest and citizens have an opportunity to be heard.* Before the 15th day before the date of the hearing, notice of the time and place of the hearing must be published in an official newspaper or a newspaper of general circulation in the municipality.

(b) In addition to the notice required by Subsection (a), a general-law municipality that does not have a zoning commission shall give notice of a proposed change in a zoning classification to each property owner who would be entitled to notice under Section 211.007(c) if the municipality had a zoning commission. That notice must be given in the same manner as required for notice to property owners under Section 211.007(c). The governing body may not adopt the proposed change until after the 30th day after the date the notice required by this subsection is given.

(c) If the governing body of a home-rule municipality conducts a hearing under Subsection (a), the governing body may, by a two-thirds vote, prescribe the type of notice to be given of the time and place of the public hearing. Notice requirements prescribed under this subsection are in addition to the publication of notice required by Subsection (a).

(d) If a proposed change to a regulation or boundary is protested in accordance with this subsection, the proposed change must receive, in order to take effect, the affirmative vote of at least three-fourths of all members of the governing body. The protest must be written and signed by the owners of at least 20 percent of either:

(1) the area of the lots or land covered by the proposed change; or

(2) the area of the lots or land immediately adjoining the area covered by the proposed change and extending 200 feet from that area.

(e) In computing the percentage of land area under Subsection (d), the area of streets and alleys shall be included.

(f) The governing body by ordinance may provide that the affirmative vote of

at least three-fourths of all its members is required to overrule a recommendation of the municipality's zoning commission that a proposed change to a regulation or boundary be denied.

*Id.* § 211.006 (emphasis added).

The context of these similar statutes indicates that the legislature intended that if a city (either through its zoning commission or city government) wishes to consider a zoning district or boundary change to a discrete piece of property, it is to ensure that owners of surrounding properties that would be affected by the change have notice and an opportunity to participate in any hearing regarding that change. That individual notice and opportunity to be heard is in addition to the general public notice and opportunity to be heard provided in section 211.006(a), and it includes the property owner itself. *See id.* § 211.006(a); *OH Skyline,* 375 S.W.3d at 584. This conclusion follows the same type of reasoning as cases from courts in other states that have construed similar individual-property-owner notice statutes as not applicable to general, broad zoning regulation changes, such as the enactment of a recodification of a zoning ordinance that rezones large parts of districts within a city as a whole. *See, e.g., Claremont Taxpayers Ass'n v. City of Claremont,* 223 Cal.App.2d 589, 35 Cal.Rptr. 907, 909 (1963); *Wanamaker v. City Council of El Monte,* 200 Cal.App.2d 453, 19 Cal.Rptr. 554, 557 (1962); *Sunset Islands No. 3 & 4 Props. Owners, Inc. v. Miami Beach Yacht Club,* 447 So.2d 380, 380–81 (Fla.Dist.Ct. App.1984), *pet. denied,* 456 So.2d 1182 (1984).

The purpose of the powers set forth in subchapter A of chapter 211 of the local government code, in which section 211.007 is located, is "promoting the public health, safety, morals, or general welfare and protecting and preserving places and areas of historical, cultural, or architectural importance and significance." *Id.* § 211.001. Another general purpose of notice provisions in the zoning context is to protect individual property owners from municipal overreaching. *Bolton,* 362 S.W.2d at 950; *OH Skyline,* 375 S.W.3d at 584.

Historically, chapter 211 was enacted in 1987 as a nonsubstantive revision of the prior law in connection with the State's codification project. *See* Act of May 1, 1987, 70th Leg., R.S., ch. 149, § 1, 1987 Tex. Gen. Laws 707, 963–68. The predecessor to section 211.007(c) was enacted in 1949, and the substantive language has not changed appreciably since then. *See* Act of Apr. 21, 1949, 51st Leg., R.S., ch. 111, § 1, 1949 Tex. Gen. Laws 205, 205. A review of numerous cases dating back to at least the mid 1950s shows that courts use the term zoning "classification" to refer to the type of larger zoning district in which property is located. *See, e.g., City of White Settlement v. Super Wash, Inc.,* 198 S.W.3d 770, 774 (Tex.2006); *Bolton,* 362 S.W.2d at 948–50 ("[T]he rights-of-way assume the zoning classification of the various districts through which they run."); *City of Waxahachie v. Watkins,* 154 Tex. 206, 275 S.W.2d 477, 479 (1955) (referring to zoning districts as classes); *Anderton v. City of Cedar Hill,* 447 S.W.3d 84, 87–88 (Tex.App.—Dallas 2014, pet. denied); *Appaloosa Dev., LP v. City of Lubbock,* No. 07–13–00290–CV, 2014 WL 3906458, at *1– 2 (Tex.App.—Amarillo Aug. 11, 2014, no pet.) (mem.op.); *Abbott v. City of Paris,* 429 S.W.3d 99, 106 (Tex.App.—Texarkana 2014, no pet.); *Reichert v. City of Hunter's Creek Village,* 345 S.W.2d 838, 842–44 (Tex.Civ.App.—Houston 1961, writ ref'd n.r.e.); *see also* Tex. Loc. Gov't Code Ann. § 211.0035(b) ("For the purposes of zoning regulation and determination of zoning district boundaries, the governing body of a municipality shall designate pawnshops

that have been licensed to transact business by the Consumer Credit Commissioner under Chapter 371, Finance Code, as a permitted use in one or more zoning classifications."); Act of May 27, 1991, 72nd Leg., R.S., ch. 687, § 22, 1991 Tex. Gen. Laws 2478, 2490 (providing that pawn shop legally operating in a municipality as a permitted or nonconforming use could relocate to another site "in the same zoning district or classification" providing it did so by time limit set forth in legislation).

Here, the City's December 2012 zoning ordinance purported to place restrictions on the types and places where businesses could sell alcohol within five different districts where alcohol sales were then permitted, including the C–1 district where the Property is located. Thus, this was not a rezoning of classification applicable only to the Property itself; the Property was still included in the C–1 district after the passage of the ordinance.[13] And, in accordance with the alcoholic beverage code, a holder of an existing permit or license to sell alcohol at the time of the passage of the ordinance would be able to continue selling alcohol afterwards even if that holder's property ran afoul of the distance requirements after the passage of the ordinance. *See* Tex. Alco. Bev.Code Ann. § 109.59.

Based on the foregoing principles of statutory construction and their application to section 211.007 and chapter 211 of the local government code, we conclude and hold that the City's interpretation is correct: additional notice to individual property owners under section 211.007(c) is not required in a case such as this one, in which a zoning ordinance change applies district-wide or across multiple districts without a change in classification of the

individual owners' properties. Accordingly, we conclude and hold that Owners failed to plead facts that would waive the City's immunity for this declaratory judgment claim. *See* Tex. Loc. Gov't Code Ann. § 245.006; *City of McKinney v. Hank's Rest. Grp.,* 412 S.W.3d 102, 116 (Tex.App.—Dallas 2013, no pet.) ("To invoke the waiver of immunity found in section 245.006, [the plaintiff] should allege facts sufficient to demonstrate that its declaratory-judgment claims come within the scope of Chapter 245...."). We overrule Owners' third issue.

**4. Other Issues Related to Owners' Chapter 245 Claims**

In their fourth issue, Owners contend that the trial court erred by dismissing their other chapter 245 claims on several statutory grounds raised by the City in its plea to the jurisdiction. Some of the grounds are nonevidentiary and some are evidentiary. We will address the nonevidentiary, matter-of-law arguments first.

**a. Definition of Permit Includes Certificate**

The City contends that chapter 245 does not endow Owners with any vested rights vis-à-vis the City because the City cannot issue any type of permit contemplated under chapter 245 with respect to alcohol. According to the City, chapter 245 applies only to the issuance of a "local permit." This is an extension of its pre-emption argument.

Local government code section 245.002 provides as follows:

(a) Each regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders,

---

**13.** The same reasoning would apply even if the term classification were to be attributed to the various enumerated "uses" within the dis-

tricts; several different uses were at issue in the enactment of this ordinance.

regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time:

(1) the original application for the permit [consent] is filed for review for any purpose, including review for administrative completeness; or

(2) a plan for development of real property or plat application is filed with a regulatory agency.

(a-1) Rights to which a permit applicant is entitled under this chapter accrue on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought. An application or plan is considered filed on the date the applicant delivers the application or plan to the regulatory agency or deposits the application or plan with the United States Postal Service by certified mail addressed to the regulatory agency. A certified mail receipt obtained by the applicant at the time of deposit is prima facie evidence of the date the application or plan was deposited with the United States Postal Service.

(b) If a series of permits is required for a project, the orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project. All permits required for the project are considered to be a single series of permits. Preliminary plans and related subdivision plats, site plans, and all other development permits for land covered by the preliminary plans or subdivision plats are considered collectively to be one series of permits for a project.

(c) After an application for a project is filed, a regulatory agency may not shorten the duration of any permit required for the project.

(d) Notwithstanding any provision of this chapter to the contrary, a permit holder may take advantage of recorded subdivision plat notes, recorded restrictive covenants required by a regulatory agency, or a change to the laws, rules, regulations, or ordinances of a regulatory agency that enhance or protect the project, including changes that lengthen the effective life of the permit after the date the application for the permit was made, without forfeiting any rights under this chapter.

(e) A regulatory agency may provide that a permit application expires on or after the 45th day after the date the application is filed if:

(1) the applicant fails to provide documents or other information necessary to comply with the agency's technical requirements relating to the form and content of the permit application;

(2) the agency provides to the applicant not later than the 10th business day after the date the application is filed written notice of the failure that specifies the necessary documents or other information and the date the application will expire if the documents or other information is not provided; and

(3) the applicant fails to provide the specified documents or other information within the time provided in the notice.

(f) This chapter does not prohibit a regulatory agency from requiring compliance with technical requirements relating to the form and content of an application in effect at the time the application was filed even though the appli-

cation is filed after the date an applicant accrues rights under Subsection (a–1).

(g) Notwithstanding Section 245.003, the change in law made to Subsection (a) and the addition of Subsections (a–1), (e), and (f) by S.B. No. 848, Acts of the 79th Legislature, Regular Session, 2005, apply only to a project commenced on or after the effective date of that Act.

Tex. Loc. Gov't Code Ann. § 245.002.

Chapter 245.001 defines a permit as "a license, *certificate*, approval, registration, consent, permit, ... or other form of authorization required by law, rule, regulation, order, or ordinance that a person must obtain to perform an action or initiate, continue, or complete a project for which the permit is sought." *Id.* § 245.001(1) (emphasis added). It defines a project as "an endeavor over which a regulatory agency exerts its jurisdiction and for which one or more permits are required to initiate, continue, or complete the endeavor." *Id.* § 245.001(3); *see also* Tex. Gov't Code Ann. § 2005.001(1) (West 2016) (defining permit as "an authorization by a license, *certificate*, registration, or other form that is required by law or state agency rules to engage in a particular business" (emphasis added)). Regulatory agency is defined as "the governing body of, or a bureau, department, division, board, commission, or other agency of, a political subdivision acting in its capacity of processing, approving, or issuing a permit." Tex. Loc. Gov't Code Ann. § 245.001(4).

Included in the definition of permit is "certificate," but the word certificate is not further defined in the statute. Black's Law Dictionary defines certificate as "[a] document certifying the bearer's status or authorization to act in a specified way" or "[a] document in which a fact is formally attested." Black's Law Dictionary 271 (10th ed.2014). And Webster's Third New

International Dictionary defines certificate as "a signed, written, or printed testimony to the truth of something." Webster's Third New Int'l Dictionary 367 (2002).

■ With regard to the definition of the type of approval required to meet section 245.001's definition of permit, Owners argue that "[t]wo City actions meet this broad definition—the denial of FLCT's vested rights petition and the adverse certification by the City Secretary on the TABC permit form. Either or both approvals were required for [Owners] to continue their convenience store project on the" Property. We agree. By including the term certificate in the definition of permit, the statute is broad enough to allow Owners to state a claim (regardless of its merit) that, at least with respect to the City's own ordinances, the City withheld an attestation of Owner's authorization to sell alcohol, i.e., a permit, on the premises described in Owners' project.

The City argues that it does not govern whether a permit is issued and that it does not have any jurisdiction over the certification process because the certification is required by statute. But the City Secretary is the person responsible for providing the certification. Therefore, the City's argument is not persuasive.

Likewise, the City's argument that the TABC is not a regulatory agency under the definition in section 245.001 fails. Owners' arguments are not based on any action or inaction of the TABC. Instead, they challenge the City's allegedly erroneous position with respect to Owners' ability to sell beer and wine on the Property as evidenced by the City's own actions and statements.

■ The City also contends that chapter 245 applies only to permits related to the "establishment of a land use and the associated land development and construc-

tion activities necessary to commence the use" and, therefore, that "the sale of particular products or other operational characteristics of a business," such as alcohol sales, are not included in the definition of "project." [14] According to the City, the plain language of chapter 245.001's definition of "project" shows "that the type of 'project' that the Legislature intended to protect through its enactment was a development project." In other words, the City contends that whether a landowner can ultimately sell alcohol on his or her developed premises is not a matter of land use or construction contemplated by chapter 245.

The City continues to focus on the narrow aspect of whether Owners can ultimately obtain a permit for the sale of alcohol rather than Owners' argument that they are entitled to use their land to sell alcohol despite the location of the school. In its plea to the jurisdiction, the City claimed, "There is no contention in this case that the City has applied newly enacted regulations that would prevent or condition the development and construction of the convenience store." The City contends that "[o]nce construction approval has been obtained, there are no further regulatory impediments to the establishment of the business, and Chapter 245 ceases to apply."

Discussing the former version of chapter 245, the supreme court has explained,

Generally, the right to develop property is subject to intervening regulations or regulatory changes. In adopting sections 481.141–.143 of the Texas Government Code on September 1, 1987, the Texas Legislature significantly altered this rule by requiring that each permit in a series required for a development project be subject to only the regulations in effect at the time of the application for the project's first permit, and not any intervening regulations. The stated purpose of the statute was to establish requirements relating to the processing and issuance of permits and approvals by governmental regulatory agencies in order to alleviate bureaucratic obstacles to economic development.

*Quick v. City of Austin,* 7 S.W.3d 109, 128 (Tex.1998) (op. on reh'g) (citation omitted). The Austin Court of Appeals has held that under the plain language of the statute, a municipal authority must consider an application for a permit solely on the basis of that authority's regulations in effect at the time the initial permit for that authority was filed. *Shumaker Enters. v. City of Austin,* 325 S.W.3d 812, 815 (Tex.App.—Austin 2010, no pet.).

The City cites *Anderton v. City of Cedar Hill* as support for its argument. In *Anderton,* the court held that "the ongoing operation of a business is not a 'project' creating any vested property rights" under chapter 245. 447 S.W.3d at 97. In that case, the zoning classification of property that was composed of two separate lots was changed several times. *Id.* at 87–88. The original lessee of the property had operated a landscaping and sand and gravel business on at least one of the lots; it was disputed whether the original lessee had operated the business on both lots or just one and whether the new lessees and eventual owners had expanded the business to the second lot before or after the most recent rezoning. *Id.*

In that case, the landowners' argument was that the continuation of the landscap-

---

14. In its plea to the jurisdiction, the City noted, "Chapter 245 applies only to the impo- sition of City regulations to a local permit."

ing business was the project. *Id.* at 95. In contrast, in their Fifth Amended Petition, Owners described the project as "future development of uses in accordance with the C–1 District zoning, including a convenience store with gas pumps which could · sell beer and wine as an incidental use on the [Property]." Thus, Owners' argument, unlike the plaintiffs' argument in *Anderton*, is based on the restriction of development and land uses, not the ongoing operation of a business. Under the City's zoning ordinance, Alcoholic Beverage · Sales and Convenience Store with Gas Pumps are both permissible land uses in the C–1 district.

Having concluded that Owners' arguments hinge on the applicability of the City's local land use regulations to the Property, we hold that Owners' claims are not predicated on the continued operation of a particular type of business and, thus, they are not excluded on that basis from section 245.001's definition of project.

### b. Inapplicability of Chapter 245 Exception

The City also contends that Owners cannot maintain a section 245 claim because the statutory exemption set forth in section 245.004(2) applies; that subsection excepts the following from chapter 245's scope: "municipal zoning regulations that do not affect landscaping or tree preservation, open space or park dedication, property classification, lot size, lot dimensions, lot coverage, or building size or that do not change development permitted by a restrictive covenant required by a municipality." Tex. Loc. Gov't Code Ann. § 245.004(2).

■ The December 2012 ordinance was an amendment to the City's zoning ordinance that restricted the locations where alcohol can ·be sold within districts where it had formerly been permitted.

Thus, it is a municipal zoning regulation within the meaning of the statute. *See id.; Milestone Potranco Dev., Ltd. v. City of San Antonio,* 298 S.W.3d 242, 248 (Tex. App.—San Antonio 2009, pet. denied) (noting that zoning contemplates the prohibition of certain physical uses of land whereas planning ·and platting make provisions for orderly growth and development). We must further determine whether Owners pled facts raising whether this municipal zoning regulation affects landscaping, tree preservation, open space or park dedication, property classification, lot size, lot dimensions, lot coverage, or building size, or whether the regulation changed development permitted by a restrictive covenant that the City had required.

■ Owners contend that the ordinance affected their property classification because it further restricted their permissible land use within the already-existing C–1 district. The plain and ordinary meaning of "affect" is "to produce an effect ... upon." *In re S.A.M.,* 321 S.W.3d 785, 791 (Tex.App.—Houston [14th Dist.] 2010, no pet.). Having determined that a property's classification pertains to the larger district in which it is zoned, we agree with Owners' contention that this ordinance affected the C–1 district by imposing additional restrictions on alcohol sales that had not been imposed between August 2009 and December 2012. Accordingly, we conclude and hold that Owners' pleadings and evidentiary facts show that the exemption in section 245.004(2) does not preclude their remaining chapter 245 claims. *See* Tex. Loc. Gov't Code Ann. § 245.006.

Finally, the City alleged that it has ·immunity from Owners' first pled declaratory judgment claim that the project start date is 2008 because Owners "did not and cannot allege facts showing the 2008 application for the project included the sale of beer and wine." The City claims that

because the preliminary site plan application listed only a convenience store with gas pumps, it did not give the City adequate notice that "the project included the sale of beer and wine." *See id.* § 245.002(a–1) ("Rights to which a permit applicant is entitled under this chapter accrue on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought."). "Because the term project is defined as *an* endeavor, rights vest in a particular project and are no longer vested if the project changes." *City of San Antonio v. Greater San Antonio Builders Ass'n,* 419 S.W.3d 597, 602 (Tex. App.—San Antonio 2013, pet. denied).

In enacting chapter 245, the legislature found the statute's requirements were necessary to prevent

> administrative and legislative practices that often result[ed] in unnecessary governmental regulatory uncertainty that inhibit[ed] the economic development of the state[,] increased the costs of housing and other forms of land development[,] and often resulted in the repeal of previously approved permits causing decreased property and related values, bankruptcies, and failed projects.

*Id.; see* Act of May 11, 1999, 76th Leg., R.S., ch. 73, § 1(b), 1999 Tex. Gen. Laws 431, 432.

In *Harper Park Two, LP v. City of Austin,* the city had urged a narrow construction of what constitutes a project under chapter 245. 359 S.W.3d 247, 250 (Tex.App.—Austin 2011, pet. denied). It contended that because in the first preliminary plan application, the owner had noted that one of several buildings would be an office, the owner's vested right to development under chapter 245 was limited solely to office use for that part of the property even though the description of the property as a whole on the plan was "Condo, Office, Commercial." *Id.* at 256–58. The court of appeals disagreed and adopted the landowner's position: that because the land use regulations applicable at the time of the plan application included all uses available under the city's commercial zoning classification, the owners' vested rights were not limited solely to office use, and the owner's original plan included hotel use. *Id.* at 258.

Here, Owners provided evidence that the City had actual notice, through Ingalls, that Owners wanted to sell beer and wine on the Property. Even though the communications occurred initially through the Frisco ISD representative, Owners presented evidence that by the time of Ingalls's communications to Williamson and Racetrac in November 2009, the City knew of Owners' concerns because it claimed that the distance requirements applied even when they had been repealed. The City disputes the significance of this evidence of actual notice, contending that under chapter 245, courts must look solely to the first application to determine if notice is sufficient. We need not resolve that particular argument, however.

Under the reasoning of *Harper Park Two,* which we adopt, the preliminary site plan application, as well as subsequent applications based on that one, gave sufficient notice (in addition to the evidence of actual notice) that the project included uses consistent with the permissible uses provided in the C–1 district. In 2008, those uses included beer and wine sales on property that was not located within three hundred feet of a public school, and in 2009, after passage of the zoning ordinance amendments, they also included beer and wine sales within three hundred feet of a public school so long as the establishment was not principally for

the sale of alcoholic beverages.[15] A plan that proposes a convenience store with gas pumps does not affirmatively indicate that the store will sell alcohol, nor does it imply that the store will not sell alcohol. Lettelier acknowledged in his deposition that he was not aware of any site plan requirement during the relevant time frame that listed the types of food and drink to be sold at a location proposing a convenience store use. Therefore, we conclude and hold that Owners pled sufficient facts to show that the City had notice of the possible types of permissible uses contemplated by Owners as required by chapter 245. *See* Tex. Loc. Gov't Code Ann. § 245.002(a–1).

Accordingly, we conclude and hold that Owners pled and raised sufficient facts to bring their remaining declaratory judgment claims under chapter 245. We sustain their fourth issue as to those claims.

### B. Regulatory Takings Claim

In their second issue, Owners contend the trial court erred by dismissing their inverse condemnation claim. The City contends that Owners have not alleged a valid takings claim because they have not shown that they have either a protected cognizable property interest or that they have a reasonable investment-backed expectation. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 491 (Tex. 2012) (holding that trial court did not have jurisdiction over dispute because property owner did not plead and prove sufficient facts to establish a viable inverse condemnation claim), *cert. denied*, —— U.S. ——, 133 S.Ct. 1999, 185 L.Ed.2d 867 (2013); *City of Carrollton v. Hamrla*, No. 02–15–

00119–CV, 2016 WL 93031, at *2 (Tex. App.—Fort Worth Jan. 7, 2016, pet. filed) (mem.op.) ("Governmental immunity is waived for *valid* takings claims." (emphasis added)). Additionally, the City argues again under this ground that it has not denied Owners anything.

In its plea to the jurisdiction, the City argued that the right to sell beer and wine is not a cognizable property interest. It further argued that Owners could not show that they have a reasonable investment-backed expectation to sell beer and wine because they have not shown that beer and wine sales were "an existing, established use," as required for such a claim, and because Owners failed to allege that they were ever allowed to sell beer and wine on the Property. Additionally, the City contends that Owners have not shown that the TABC has ever issued an alcoholic beverage permit for the Property. According to the City, the distance restriction was applicable to the Property at the time it was purchased, and the Property "continued to be subject to the beer and wine restriction" when 7–Eleven sought and was denied a permit.

 Property rights are created and defined by state law. *See Stratton v. Austin ISD*, 8 S.W.3d 26, 29 (Tex.App.—Austin 1999, no pet.) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Generally, a property owner has no vested right to use its property in a certain way without restriction. *See Azadpour v. City of Grapevine*, No. 02–13–00323–CV, 2014 WL 2566024, at *4 (Tex.App.—Fort Worth June 5, 2014, pet. denied) (mem.op.); *Mr. W. Fireworks, Inc. v. Comal Cty.*, No. 03–

---

15. If the project commenced in 2008 and continued for purposes of the statute through passage of the 2009 ordinances, Owners pled that they were allowed to take advantage of that change in the permitted uses within the C–1 district. *See* Tex. Loc. Gov't Code Ann. § 245.002(d) (permitting project applicant to "take advantage of" changes in laws, rules, regulations, and ordinances that "enhance or protect the project").

06–00638–CV, 2010 WL 1253931, at *8 (Tex.App.—Austin Mar. 31, 2010, no pet.) (mem.op.). Nor is a license or permit to sell alcohol a vested property right. Tex. Alco. Bev.Code Ann. § 11.03 (West 2007); *Tex. Liquor Control Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex. 1970).

As we have explained, however, Owners are not claiming that the City has denied them a license or permit to sell alcohol; instead, they are claiming that the City unreasonably interfered with their existing property rights by erroneously applying distance requirements to the Property in contravention of Owners' chapter 245 vested rights.[16] Accordingly, Owners argue that on these facts they properly alleged a *Penn Central* regulatory takings claim. 438 U.S. at 123–24, 98 S.Ct. at 2658–59.

Under the *Penn Central* test, a regulatory taking can occur when government action unreasonably interferes with a landowner's use and enjoyment of the property. *Sheffield*, 140 S.W.3d at 671–72. It is an ad-hoc, fact-intensive inquiry rather than a formulaic test. *Id.* at 672–73. Guiding considerations under the *Penn Central* test include (1) "the economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Id.* at 672; *see Hearts Bluff Game Ranch*, 381 S.W.3d at 477–78. The focus of the inquiry is whether the regulation has gone "too far" so as to constitute a taking. *Sheffield*, 140 S.W.3d at 671–72. The extent of the governmental intrusion may be a question for the trier of fact, but whether the facts alleged constitute a taking is a question of law. *Id.* at 673.

16. Contrary to the City's argument, Owners are contesting the applicability of the regulation to the Property; thus, *City of Houston v.*

### 1. Character of the Action

Although Owners presented evidence supporting a conclusion that the City's passage of the October and December 2012 ordinances was precipitated by the City's discovery that the 2009 zoning ordinance amendment allowed alcohol sales on the Property and other similarly situated properties, that same evidence does not necessarily support a conclusion that the City intentionally targeted the Property or Owners. The changes effected by the 2012 amendments applied across five zoning districts and to multiple types of permissible uses within those districts. And the distance ordinances are permissibly delegated to municipalities under the alcoholic beverage code. Tex. Alco. Bev. Code Ann. § 109.33(a)(1).

On the other hand, we have already rejected the City's argument that it has not denied Owners anything; as we pointed out, the City affirmatively represented to Racetrac and 7–Eleven that it would enforce the distance requirements included in its ordinance, and it denied Owners' vested rights application. The City additionally argued in its immunity ground that it had

· performed its functions as required under the Alcohol Code by filling out the TABC permit form, but did not refuse to allow [Owners] the right to sell beer and wine on the Property. The TABC controls whether beer and wine can be sold on the Property—not the City. Only the TABC can issue a permit to sell beer and wine on the Property. The City, therefore, cannot refuse to allow [Owners] to sell beer and wine on the Proper-

*Carlson* does not control here. 451 S.W.3d 828, 831–32 (Tex.2015).

ty as the TABC decides whether to issue the permit in question.

As we have discussed, the City overlooks the statutory role of its secretary to certify to the TABC whether its own local requirements—permitted by constitution or statute—that are not in conflict with the alcoholic beverage code preclude the sale of alcoholic beverages in a certain location. *See id.* §§ 11.37(b), 251.71(a) (West 2007). By certifying to the TABC that its local requirements prohibit the sale of alcoholic beverages at the location, and by arguing the same in the subsequent Denton County Court at Law Number Two court proceeding, the City allegedly prevented Owners from being able to use their land in accordance with what Owners argue is a permitted use because of their first-in-time application. Thus, Owners alleged a refusal by the City that impacted their ability to use the Property in accordance with its applicable zoning classification. Whether the City actually had an enforceable first-in-time policy is a factual determination that goes to the merits of Owners' claims and not the trial court's jurisdiction.

## 2. Economic Impact

■■■ Regarding economic impact, Owners presented Williamson's affidavit, which states in part:

> Both the Racetrac sale and 7–[Eleven] lease were not consummated and a convenience store not built due solely . . . to the City's refusal to allow beer and wine sales on the FLCT Tract. There are no convenience store owners and operators that will construct a convenience store on the FLCT Tract unless beer and wine can be sold. Using the income valuation methodology, the approximate devaluation in market value of the FLCT Tract due to the City's actions is $750,000.00 or 46% of the total market value. Plaintiffs also have incurred lost profits and rents in excess of $100,000.00. This is a significant adverse economic impact on [Owners].

This is the type of evidence that a trial court can consider in a regulatory takings claim, and a diminution of forty-six percent (in the absence of any contravening evidence regarding what Owners might have paid for the original tracts) is significant. *See Sheffield,* 140 S.W.3d at 677; *Edwards Aquifer Auth. v. Bragg,* 421 S.W.3d 118, 139–40 (Tex.App.—San Antonio 2013, pets. denied).

## 3. Investment–Backed Expectations

■■■ The supreme court has noted that "[h]istorical uses of the property are critically important when determining the reasonable investment-backed expectation of the landowner." *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 933 (Tex. 1998). Regulations at the time of purchase should be considered in determining whether the regulation interferes with investment-backed expectations. *Id.* at 938. And knowledge of existing regulations "is to be considered in determining whether the regulation interferes with investment-backed expectations." *Id.* at 936.

The City contended in its plea to the jurisdiction that Owners can have no reasonable investment-backed expectations because the TABC has never issued a permit for the sale of alcoholic beverages on the Property and because when Owners purchased their tracts, they could not have obtained such a license or permit if a school had already been operating within three hundred feet of the Property. The City pointed to Williamson's testimony at 7–Eleven's permit hearing in which he said that in March 2009 when Owners sold part of their tracts to Frisco ISD, he did not know that the 300–foot separation requirements were applicable to the Property. Likewise, he could not remember when Owners received a copy of Ingalls's letter

to Wilkerson of Frisco ISD, but according to Williamson, it was in Owners' files for the Property, and Owners "may well have" relied on the letter in closing the sale to Frisco ISD. Williamson also testified, however, that he thought alcoholic beverages could be sold at the Property even after the construction of the school because of Ingalls's letter.

Here, unlike in *El Dorado Amusement Co.*, which the City relies on, and *Mayhew* upon which its holding is based, there is no evidence of a historical use of the Property other than as vacant land. *Id.* at 937–38; *City of San Antonio v. El Dorado Amusement Co.*, 195 S.W.3d 238, 246–47 (Tex. App.—San Antonio 2006, pet. denied). Owners purchased the land specifically for development purposes and attempted to pursue development of a convenience store use repeatedly. Although the Property is still vacant, it is not for lack of activity regarding the proposed development; Owners presented evidence that both times a purchaser or tenant reached the alcoholic beverage permit application process in conjunction with the planned development set forth in the preliminary site plan application, the City's stated position that the separation requirements applied caused the prospective purchaser and tenant to back out.

The City analogizes to the *Hallco* case, and Owners rely on *City of Dallas v. Millwee–Jackson Joint Venture*, No. 05–13–00278–CV, 2014 WL 1413559, at *7 (Tex. App.—Dallas Apr. 4, 2014, pet. denied) (mem.op.); *Hallco Tex., Inc. v. McMullen Cty.*, 94 S.W.3d 735, 738 (Tex.App.—San Antonio 2002), *aff'd on other grounds*, 221 S.W.3d 50 (Tex.2006). The court of appeals in *Hallco* relied on the supreme court's statement in *Mayhew* that the "existing and permitted uses" of property are the primary expectation of a landowner affected by regulation to hold that a land-owner who purchased vacant property did not have a reasonable investment-backed expectation to use its property as a solid waste disposal site because at the time the county passed an ordinance prohibiting such a use of the site, Hallco had applied for but not yet received a state permit to allow it to so use the property. *Hallco*, 94 S.W.3d at 738; *see Mayhew*, 964 S.W.2d at 936.

*Hallco* and *El Dorado Amusement* construe the *Mayhew* court's statement of the holding in *Penn Central* to mean that we must look to historical uses that were existing or for which the landowner already had applied for and received a permit of some kind; however, a reading of the supreme court's opinion in *Sheffield* belies that interpretation. In *Sheffield*, the court determined that a developer who purchased undeveloped property in a planned unit development district nevertheless had a reasonable, investment-backed expectation that he could develop the property in accordance with the allowed uses available in the zoning classification before the city downzoned the property. 140 S.W.3d at 677–78. Although the court ultimately held that there was no taking in that case, we believe that in light of the discussion in *Sheffield*, the better construction of "permitted uses" means allowed uses rather than uses for which a permit has already been issued. Nevertheless, we do not hold that a prior permit held by a property owner is not significant for purposes of this analysis but rather that the fact that a permit had not yet been granted at the time of the alleged taking is not outcome determinative of whether the owner's investment-backed expectations are reasonable.

In *Millwee–Jackson*, the landowner, a joint venture, purchased property near Interstate 35 on which a billboard had been located, but it purchased the property with

the intention of developing it for a hotel or office building. 2014 WL 1413559, at *1. To provide access to the development, Millwee–Jackson needed approval from the city to build a bridge; Millwee–Jackson contracted to sell the property to a developer, but the contract did not close because the city allegedly delayed approval of the bridge plans. *Id.* Time passed without further development, partly due to an economic downturn in the mid 1980s. *Id.* In 1998, the city deleted the street to which the bridge would have connected from its master thoroughfare plan; in 2002, the city closed that street, and DART began construction of a light rail near Millwee–Jackson's property. *Id.* The city denied Millwee–Jackson's application for approval of the bridge in 2007. *Id.* at *2.

The court of appeals held that Millwee–Jackson alleged facts showing that its development expectations were reasonable despite the lapse in time between the time it bought its property and 2002, when the city closed the street to which Millwee–Jackson would have provided access to its proposed development. *Id.* at *6. The court noted that no one *Penn Central* factor is determinative and that this factor was the only one challenged by the city in that case. *Id.*

The City argues that *Millwee–Jackson* is inapplicable because in that case, the landowner did not have to further apply for a permit from a state agency to realize its investment-backed expectations. But as we have already explained, Owners' arguments are not based on their inability to obtain a permit but rather the City's alleged erroneous enforcement of its own local regulation.

The City alleged in its supplement to its plea to the jurisdiction that this case is similar to *West Hardin County Consolidated ISD v. Poole*, 384 S.W.3d 816 (Tex.

2012). In that case, the school district foreclosed a judgment lien on an oil and gas lease, and the Railroad Commission ordered Poole to plug a well on the lease. *Id.* at 817. When he failed to do so, the Commission plugged the well and brought an enforcement action against Poole for the costs. *Id.* Poole settled the claim and then sued the school district alleging that its actions had resulted in a taking of his property. *Id.*

The supreme court rendered judgment dismissing the case, concluding that Poole had failed to allege a valid takings claim. *Id.* Specifically, the court held that by alleging that "the District 'refused to resolve this situation and/or replace Poole as Lease operator—thereby playing Poole against the Commission and causing Poole to pay excessive well plugging costs and Lease clean-up costs, all (or a substantial portion of which) were the liability of [the District,]" Poole had alleged only an injury and not an actual taking of property. *Id.* According to the City, here, Owners have only alleged an injury—the denial of 7–Eleven's TABC permit application—and not a taking of property and that the only thing the City did was to certify to the TABC that it has an ordinance that restricts the sale of beer and wine within three hundred feet of a school. Unlike in *West Hardin*, however, Owners allege that it is the City's erroneous enforcement of its own local separation requirements to the Property that are the cause of the regulatory taking. Therefore, that case is not controlling.

The City also contended that this case is controlled by *Hearts Bluff Game Ranch.* In that case, Hearts Bluff purchased wetlands on a site identified by the Texas Water Development Board (TWDB) as a potential reservoir location. 381 S.W.3d at 473. It then applied for a mitigation banking permit from the U.S. Army Corps of

Engineers, which denied the application because, in response to its request for commentary on the proposed credit, the TWDB indicated that the site was a potential reservoir site and that it opposed granting the credit. *Id.* at 474–75. Holding that the State lacked any regulatory authority to deny the federal permit at issue, the supreme court affirmed the court of appeals's judgment reversing the trial court's denial of the State's plea to the jurisdiction. *Id.* at 473, 480–87, 491–92.

Unlike the TWDB in *Hearts Bluff*, however, the City was free to implement and enforce its own distance requirements by authority in the alcoholic beverage code. *See* Tex. Alco. Bev.Code Ann. § 109.33(a)(1). The certification required by the City is statutorily-required, but so long as the City's regulations are not more restrictive than the restrictions in the alcoholic beverage code, the City has the authority to enforce its regulations. Therefore, we do not believe *Hearts Bluff* is controlling here.

Although whether a valid takings claim has been alleged is a question of law, here, fact issues exist that must be resolved by a fact finder, including the extent of the economic impact on the Property and whether the City had a first-in-time policy regarding development. *See Millwee–Jackson*, 2014 WL 1413559, at *7. Accordingly, we conclude and hold that the trial court erred by dismissing Owners' inverse condemnation claim for lack of jurisdiction. *See Cty. of El Paso v. Navar*, No. 08–14–00250–CV, —— S.W.3d ——, ——, ——, ——, 2015 WL 4711191, at *1–2, *5 (Tex. App.—El Paso Aug. 7, 2015, no pet.) (holding that Navar adequately pled *Penn Central* claim by alleging that County wrongfully refused to certify on plat that water and sewer service on property was compliant with local government code section 232.028(b) and (d)); *Vill. of Tiki Island v. Ronquille*, 463 S.W.3d 562, 582 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (holding that plaintiff adequately alleged that ordinance against short-term rentals met elements of *Penn Central*). We sustain Owners' second issue.

## VII. Conclusion

Having sustained Owners' first, second, and fourth issues as to their inverse condemnation and declaratory judgment claims not based on section 211.007(c) notice, we reverse the trial court's judgment dismissing those claims with prejudice. Having overruled Owners' third issue with regard to their pled declaratory judgment claim that the December 2012 ordinance is void based on lack of notice to individual property owners, we affirm the trial court's judgment as to that claim only.